The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and this Honorable Court. We'll hear argument first in Number 19-1766, In Re Advanced Media Networks, Mr. Ostro. Thank you, Your Honors, and good morning. Hopefully you can all hear me, but if at any time you have trouble hearing me, please let me know, and I'll see if I can make an adjustment on my end. So, again, my name is Seth Ostro. I represent the patent owner, Advanced Media Networks. We are appealing a ruling by the Patent Trial and Appeal Board confirming invalidation of all claims of Patent Number 6445777 over a variety of different prior art references. And we went through in the lengthy briefs and the even lengthier, quite lengthy appendix, the fact that this patent and its parent patent, 5960074, the 074 patent, have both undergone substantial prior reexaminations as well as interparty review petitions. And in all the previous instances, there were eight previous reexaminations total and seven IPR petitions. In all of those cases, the examiners or the board reached a conclusion that these claims were patentable over much of the same prior art as presented now in this appeal. There are one or two new references, but for the most part, the prior art is more or less the same as it was in all of these various prior proceedings. And the main reason why, as far as we can tell, this particular reexamination is coming out differently boils down to what we view as a claim construction issue. And it's a claim construction issue that we do not believe the board addressed at all and certainly not to any standard that meets the Administrative Procedure Act. And it boils down to what I'll use claim one of the 777 patent as my example, although essentially the argument is the same for the other claims. The claim has three elements. There's a satellite communication subsystem, a wireless local area network. I'm paraphrasing for the sake of time. And then we get to this third element of a mobile unit. And the mobile unit has to be configured, according to the claim, to transfer broadband information as a single nomadic transmission reception point between the satellite communication subsystem and the wireless LAN using an Ethernet packet switching protocol. So those are kind of a mouthful, but it is that element that we believe is being interpreted by the examiner in this ex parte reexamination and then the board and then even the director in this responsive appeal brief differently than it ever was interpreted in any of the prior proceedings. So as such, we believe it conflicts with all of those prior proceedings, doesn't follow them as precedent, and is incorrect. There are three things about this element that we believe... The prior proceedings are not precedent, are they? Well, we believe that the board's own ruling in the IPR acts as precedent. We understand that the board is not bound by previous examiner findings, but we believe the board should be bound by its own previous findings. Okay. The three main issues that go to the heart of the claim construction of this element is, one, whether to even give it any patentable weight at all. So one of the problems that has arisen is that first the examiner and then the board do not really give patentable weight to this element. The origination for this was at first the examiner took a new position that had never been taken before, that the phrase immobile unit was a nonce word and therefore had to be interpreted under Section 112, Paragraph 6. That was incorrect and the board changed that. But the result of that was that the examiner considered essentially the rest of the claim as the function being performed by that means element and didn't get any patentable weight. Meaning to say if he could find prior art that showed that structural element, it didn't matter whether it performed the function. Even though the board overruled that issue and concluded that it should not be treated as Section 112, Paragraph 6 element, they still essentially are not giving any patentable weight to the rest of the claim. And in the director's brief, that error is compounded by the director repeatedly arguing that anything in the prior art that is capable of, quote, unquote, capable of performing this function, therefore meets the element. That's not correct. We have argued both to the board and now to this court that the mobile unit in this element must be, as a structural matter, must be configured to perform the function of transferring the information using this particular protocol to both of these networks, both of these wireless networks. And if the claim, if there were a mobile unit that was not so configured, it would not meet this limitation. So when it's properly interpreted to include this limitation, as I indicated, all the previous, the board itself and the previous IPRs and the previous examiners all concluded that this element distinguished over all the prior art, including, for example, the Kugler patent, which is one of the main references being asserted here, through its parent patent, which we refer to as the Norand patent, the assignee, which was an earlier patent in the same family which had all the same relevant disclosure. The board found this claim patentable over that, but now we're dealing with the same reference and now it's not patentable. Similarly, the claims were found patentable over most of the other references, the Riebeck patent, the Eng patent, an article, the Norm Oil article. All of those were found to be distinguishable because of this, when this element was given patentable weight. Another aspect of the claim construction issue that we believe the board simply failed to address and has gotten wrong is, when I say failed to address, they failed to address it explicitly and provide any justification for why they're reading the claim this way, is that this element requires that the mobile unit be configured to transfer information, again I'm paraphrasing, between these two wireless networks. The wireless networks are the satellite communication subsystem and the wireless LAN. As such, the claim inherently requires that that be done on a wireless basis. The mobile unit could not connect or transfer information between two wireless networks unless it was doing so wirelessly. This was always understood to be the case in all of the previous proceedings, but here it seems to have dropped out, that somehow if there were a wired connection that would satisfy it. Well, again, yes, in some of the prior art there are structural similarities with wired connections in which, for example, TCPIP is used, but that doesn't show a wireless connection, an end-to-end wireless connection bridging the two wireless networks. A third aspect of this element which, again, we believe is a claim construction issue that the board simply failed to justify and is incorrect about. Excuse me, this is Judge Stoll. You know, when I look at the board's analysis, for example, I mean, I'm sorry, the examiner's analysis, for example, I mean, he seems to be addressing the wireless claim element and saying that Norm Oil, for example, shows a wireless mobile Ethernet wireless LAN, which I understand he might disagree with that assertion, as a matter of fact, by the examiner, but I'm having a hard time understanding your position that the claims were construed to not require wireless. Thank you for asking that question, Your Honor, because it allows me to clarify that what I am arguing, what we are arguing, is that it is the wireless connection on both sides that needs to be shown in the prior art. So there is prior art, as you mentioned, Norm Oil being one, that does show a wireless LAN. We did not invent wireless LANs, but certainly it's in the prior art. But what we are arguing is that this function that's required of the mobile unit has to be done wirelessly on both ends. And if the prior art doesn't show that, it doesn't disclose this element. Since you raised the Norm Oil reference, the problem from our perspective about Norm Oil is that the same protocol, and this segues into the third issue that I wanted to raise, which is that this element requires that the same protocol, this Ethernet packet-switching protocol, has to be used in the transfer of information on both sides of the network. So as between the mobile unit and the satellite system, and between the mobile unit and the wireless LAN, has to use the Ethernet packet-switching protocol, the same Ethernet packet-switching protocol, to transfer information, this is just what the claim says in our view, between these two wireless networks. Norm Oil does not disclose that. In Norm Oil, again, I'm only discussing that because you raised it, as we've argued, there's a protocol converter in their hub system that converts the protocol from what it is on one side to what it needs to be on the other side, and then back again. Our claim does not require any protocol conversion. This is a key distinction over really all the prior art, Norm Oil included, because what we're claiming is that the mobile unit uses the same, I added the word same, but in our view that's the claim construction issue, the same Ethernet packet-switching protocol on both sides. The reason this is important from an inventiveness point of view, a non-obviousness point of view, is that this allows the fact that an Ethernet packet-switching protocol is being used, the same protocol on both sides, allows users of the wireless LAN to go end-to-end communication with the same protocol, with servers, for example, connected over the satellite communication system. The use of the Ethernet packet-switching protocol, in particular, facilitates an Internet connection. Back when this was filed in 1996, the parent application, the priority date, this wasn't done. Now, of course, we take this for granted because we've all been on airplanes and had Internet access, or boats, or trains, maybe not nowadays because of restrictions, but in normal times we ride all of these vehicles and we're able to get onto the Internet, and it's this invention that facilitates that. So, in all of the prior art references, Rebec, Kugler, there is either a proprietary protocol, as we pointed out, or different protocols that have to be used and converted, and they would not facilitate the use of this protocol, which makes seamless communication over the Internet while traveling in a vehicle possible. And do you also contend that DUDA does not disclose an Ethernet packet-switch protocol? It may disclose a packet-switch protocol, but it is not an Ethernet packet-switching protocol. Now, there are many different types of packets, packet networks. For example, there are packet networks that are circuit-switched. Let me try to wrap up quickly. There are networks where data could be transmitted packets in a connected, oriented way, such as a circuit-switched network, or, more relevant for DUDA and other references, an ATM network. So, in an ATM network, there's a dedicated transmission path for the transmission of packets. That's not how the Internet works, so that would not facilitate a user's connection to the Internet in that prior arc. Okay, Mr. Ostrow, do you want to save the rest of your time for rebuttal? As long as I've answered Your Honor's question to her satisfaction, yes. Yes, thank you. All right, then, yes, I'll reserve the rest of my time. Thank you, Your Honors. Thank you, Mr. Ostrow. Mr. LaMarca? May it please the Court, William LaMarca for the PTO. Your Honors, it looks like I'm going to try to do my best to respond to what Appellant has focused on. His main focus seems to be that the claimed protocol, Ethernet packet-switching protocol, is not in the prior arc. Apparently, that's his main concern, and also the way the term was construed. Well, first of all, I'd just like to point out, and we pointed out this in our brief, that the interpretation of that phrase, Ethernet packet-switching protocol, there was a proposed construction provided by Advanced Media in their brief to the Board at page Appendix 1440. And if I can just read you that construction that they proposed, their argument was that an ordinary artisan would have interpreted, quote, as a protocol for communication between devices over a network via a shared connectionless transmission medium in which data to be transmitted is divided into formatted packets for individual transmission and subsequent reassembly at the attended destination. This gives meaning to all of the words in the phrase, quote, Ethernet packet-switching protocol, quote, quote, and is consistent with the findings of the Office in previous reexamination. So that's what they argued for the Board. Now, if you look at the examiner's final action, if you look at the examiner's answer, what you'll find is the examiner followed that exact interpretation of that that was proposed by Appellant. So there is really no dispute over how to construe that phrase. And when you read that phrase, what you find is the prior arc, Rebec, for example, one of the anticipatory reference that we're focused on here, indeed shows a wireless network. It does show wireless connections between a satellite, between a mobile unit, and between a local area network. All of that's disclosed in Rebec. The only thing that Rebec does not expressly state is it doesn't expressly mention Ethernet packet-switch protocol. Nevertheless, Rebec does talk about using protocols, adapting to use varying protocols to be adaptable so they can communicate with various different networks, and they specifically disclose the use of protocol converters to help them achieve that. So accordingly, what the examiner did was he looked at that disclosure and looked at this definition of Ethernet packet-switching protocol, the claim language that was provided by Appellant, and the examiner found, yes, Rebec has everything disclosed except for the express mention of the use of this particular type of protocol, Ethernet packet-switching protocol. From the examiner's view, he found that if the prior art was capable of using that protocol as one of the various protocols that Rebec talks about, that would be sufficient to, therefore, qualify as an anticipatory prior art reference. But the examiner went further and said, even if that's not good enough, it would have been obvious, and that's where the secondary references come in, like DUDA and NORML. And I believe Judge Stoll asked about DUDA, which does mention packet-switching protocols, but it doesn't mention Ethernet packet-switching protocols. But then the examiner went further, and he pointed to the NORML reference, and if you look at the NORML reference, you'll see citations there, and I can provide them here if you want me to, but they're in our brief, that specifically mention Ethernet packet-switch protocols. In fact, they even cite IEEE reference numbers like 802.... I can't remember the exact numbers, but they cite specifically Ethernet packet-switching protocols used in a wireless context. Now, on top of all of that, there's no dispute here that Ethernet packet-switching protocols were known at the time of the invention. In fact, during oral hearing before the board, I believe, you know, the advanced media's attorney at oral hearing before the board asked that specific question. He said, well, can you tell us, are these Ethernet packet-switching protocols, is that something new? And let me read you a quote from page Appendix 1784 from one of the APJs, Judge Jeffrey, the question, is an Ethernet packet-switching protocol a known technique in a wireless local area network generally? But just in general, could it be said that that was a known technique? The answer from the attorney for advanced media, yes, we certainly did not invent connectionless protocols. So what I'm trying to point out here, Your Honor, is that there is no... this is a known communication protocol. The whole purpose of communication protocols is to create consistency of communications between varying networks. Rebex shows all the features of the claim, except it doesn't expressly mention a known protocol that was known at the time. The examiner's finding, it would have been capable to use a known protocol because it talks about using protocols and it talks about using protocol converters. And even if it weren't true, that even if you didn't buy that finding and didn't accept that, the examiner went further and basically supported the fact that secondary references like Duda, like Normoil, which also show wireless communication networks at the time in the same field, in the same field of endeavor, same type of art, they do use these types of protocols. So I think that's fundamentally why the claim was rejected. This is Judge Stoll. I have a quick question, which is, I think one of the contentions being made here may be that there is no discussion of a reason to modify Rebex and View of Duda and Normoil to have the Ethernet protocol. Where do you think that is best addressed in the board's opinion or maybe in the decision... in the examiner's answer? I think we... Your Honor, I understand. Thanks for the question. And I understand we did try to address that in our brief as well. And let me take you to a few sections where we find that the examiner indeed, he did articulate reasons why you would use the secondary... features from the secondary references with, for example, the Rebex reference. And if I can take you, let's see now, to a few of those pages, I'll try to find that for you here. Let's just go. To make it easy here, I can probably take you right to our brief because we've gone through this in our brief. At page 49 of our red brief, you'll see a section entitled, Substantial Evidence Supports the Finding that There Was Motivation to Combine the Prior Art. And we go through here and we give citations to what the reasons would have been. And we also talk about their argument. But let's just see here if I can get you to... at the bottom of the page. Are any of those sites the board's opinion? Well, what the board does, Your Honor, and I understand that this is a problem for appellant. The board, what they do is they simply point to the examiner's determination. So what we really have to do is take the board's decision as a roadmap to just get us back into the examiner's final action. And the examiner's answer, because that's where most of the specific findings are made. And then what the board is basically doing is responding to arguments and explaining that they either were or were not persuaded. And then they point to the examiner. So really, you're not going to find them... This particular argument, if I recall correctly, was not raised in the briefing to the board, the motivation to combine arguments. I think that's correct, Your Honor. So you're not going to see much talk of it. But what we've done in our brief is we've gone back to the examiner's answer as well as the examiner's final action to point out where the examiner did indeed make motivation to combine a rationale. Those are in the examiner's papers. And that's all I'm trying to find here for you now. It is a voluminous record, and I apologize if I'm a little slow getting to it for you. That's okay. I see it in your brief. Let me ask you a different question, Mr. Lamarck. Sure. I heard Advanced Media's counsel saying that if this claim were interpreted as a 112-6 paragraph claim, then the functional language in the claim could be ignored when doing a validity analysis. I don't think that's correct. What do you think? Yeah, I think... Do you think that is the proper way to analyze the claim? Well, no. Assuming for a minute that it's in 112-6 paragraph format. Right. Currently... Well, I mean, I don't know if... And let me make sure I got the question correctly. What happened here was the examiner initially did attempt to treat the claims as 112-6 claims, and the board overruled that and said, no, examiner, those are not 112-6 claim phrases because there's sufficient structure in the claim, and therefore we're not going to treat them as 112-6 paragraph. However, there is functional language in the claim or statements of intended use in the claim, and that's what the examiner did treat as functional language for evaluating the patentability of these claims. I don't know if that answers your question or if you're asking me something a little different, Your Honor. Well, let me just ask it in a little bit more simpler way. The functional language in the claim should be given weight, right? And the examiner gave it weight and addressed it, and so did the board, right? Correct. And the way we see that is if you look at Claim 1, for example, which is on the inside of our red brief just to make it easy, you'll see at the end of the claim there it says, communication subsystem in the wireless LAN using an Ethernet packet switching protocol. So the way the examiner read that and the way the board read that is, yes, you've got this network, a wireless network of all these devices, and it uses an Ethernet protocol, which is simply a communication protocol. Remember, different protocols can be used on the same network. The protocol is really the way the data is processed so the data can communicate with another network that you're trying to reach. So these we view, the agency views, and the board and the examiner both view those as really functional language or statements of intended use. So that's not ignoring the language. It's just treating it as functional language. It was a little different than a structural component. So I don't think that the office ignored the language. They recognized that there indeed was functional language in the claim, and the examiner analysis follows that. And if you go through the examiner's analysis, you'll see that the examiner does indeed find prior art references and find rationales why the claimed use would have been used on the prior art networks. Or it's either disclosed, and if it's not expressly disclosed, it would have been obvious to be there, or it's either that, or it's capable of being used that way. This is basically the examiner's analysis with all of these features. So we would disagree that the examiner ignored the language. It's just he treated it as functional language. That's all. I'm sorry, Your Honor. Did you have another question there? No, I didn't say anything. The only other point that I'd like to make that was raised by a panelist, and I'm probably getting very close to the end of my time. He did talk about prior proceedings. And, yes, there were prior proceedings where a related patent called the 074 patent was brought up, and in that 074 patent, indeed, there was a petition for an IPR, and I believe they brought this up in their brief, and in that petition for the IPR, that it was denied. It was not instituted based on, I believe, the Kubler reference. However, we point out in our brief that the board actually dealt with that at the hearing and clarified that point and said, you know, the board never said this Kluger reference didn't have these features. The board simply said that that petition wasn't sufficient, so they denied the institution. So that's one example of a prior proceeding where an appellant has raised where, in their view, a particular reference that an IPR was denied, therefore, we could never, ever look at that reference here in this case. We don't agree with that. We think the issues were different. The board pointed out that the reason for the denial was not a statement about the reference. It's just they felt the petition wasn't adequate. Furthermore, the issues here aren't quite the same. We have different combinations of references with different teachings that are being referred to, so we don't think we're bound by any of those prior proceedings that the appellant references, Your Honor. Can I ask this? This is Judge Toronto. Would it also be the case that issue preclusion, for example, would not apply to an IPR petition denial since under the statute that's not reviewable on appeal and issue preclusion doesn't apply when the decision is not reviewable on appeal? Well, yeah. Well, first of all, it's not a final written decision, so there really is no final decision by the agency. It's just simply a denial that they didn't meet the initial threshold to have the agency institute a proceeding. But you're right. I mean, we don't see that issue preclusion would apply in that instance. However, that doesn't mean the agency doesn't strive for consistency. I think they do. Right. I guess that's all I was really trying to get straight. Right. The blue brief talks about binding, and it seems to me that ordinarily when you hear the word binding, at least one thinks of a variety of preclusion-type doctrines, whether race, judicata, issue preclusion, law of the case, and whatnot. And I guess it feels to me like none of those actually map on to this in particular because the one being supposedly bound is the decision-maker as opposed to some adversary. Right. Well, we wouldn't have been a, quote, party to the case like in an adversarial proceeding. Furthermore, the issues wouldn't have been fully and fairly litigated, which is some of the requirements for estoppel or some type of issue preclusion to apply. None of that occurred here. So I don't see how this case really is independent of those cases is the way we see it. And there are findings here, and we believe there's substantial evidence here, and we've done our best to provide a road map to point you to the evidence in the record that supports the findings by the examiner and the board. And accordingly, in our view, that's why these claims are impatinable. I really have to—I'm sorry, Your Honor? Anything further, Mr. LaMarca? I have nothing further, Your Honor, unless there's anything else from the court. Hearing no further questions, thank you. Mr. Ostrow? Yes, thank you, Your Honor. Let me just address a few of those points. I only have a couple of minutes anyway. So Mr. LaMarca indicated that we had admitted that Ethernet packet switching protocols were not— were disclosed in the prior art. Well, of course they were. We did not invent those. That's not the issue. The issue is the combination of using—of having a mobile unit that uses such protocols to transfer information between these two wireless networks, the same protocol on both sides without having to convert it, as in the Rebec or Norm Oil references in other prior art, whether that application is not obvious. Again, in all the prior proceedings, when that element was given full patentable weight as a structural limitation and not just some function, all the examiners and the board, you know, found that it was patentable. Again, with respect to Rebec, which came up during Mr. LaMarca's comments in a little bit more detail, there's a protocol converter. There's a few things to point out. Clearly there was a protocol converter. There's not the same Ethernet packet switching protocol or the same protocol at all being used on both wireless networks. The Ethernet packet switching protocols in Rebec, as we've indicated, as we've argued in the brief in other places, are only on the wired portion. So the way Rebec works is that there's a truck driver and he has a little suitcase, and he drives around and he collects information and he goes back. When he gets back to the factory or the delivery place, he can then—the suitcase transmits messages to the LAN in the factory. That LAN may use TCPIP, but nowhere else in Rebec is that used in the wireless portion, TCPIP being an example, according to the 777 patent of an Ethernet packet switching protocol. So as long as this element is interpreted in our view correctly, it's clearly distinguishable from everything, including the Rebec reference. And again, I point out even now during Mr. Lamarcka's comments, he's still arguing that if the prior art shows that something is capable of carrying those protocols, that would meet the element. And our position is that the claim has never been interpreted that way and it is not a correct interpretation, and the board did not provide any rationale for such an interpretation. It's not sufficient for a component to be capable of carrying protocols. Protocols, as Mr. Lamarcka said, are just data. Okay, thank you, Mr. Ostro. Thank both counsel. The case is submitted.